William B. COVERT, Libelant,

v.

CENTENNIAL QUEEN, her engines, tackle and gear, and any and all persons claiming any interest therein, and Oregon Navigation Co., a corporation of the State of Oregon, Respondents.

Civ. No. 383-59.

United States District Court
D. Oregon.

March 3, 1960.

Green, Richardson, Green & Griswold, Portland, Or., for libelant.

Mautz, Souther, Spaulding, Kinsey & Williamson; Kenneth E. Roberts, Portland, Or., for respondent.

KILKENNY, District Judge.

Libelant claims that he was a crewmember and in service of defendant vessel and that respondents are liable for his maintenance and cure. Respondents deny these claims and urge that libelant should have sought maintenance and cure from the Public Health Service under the provisions of Title 42 U.S.C.A. § 249.

Libelant was hired as a fireman in Seattle, Washington, and worked on board "The Centennial Queen," then known as "The Shasta," for approximately four or five weeks before the ship was transferred to Portland, Oregon, in August, 1959. The ship was moored in Portland Harbor while work crews refurbished it for use by respondents in conjunction with the Oregon Centennial celebration. Libelant worked the shift aboard said vessel from 12:00 midnight to 8:00 a. m. on June 3, 1959, while the vessel was being moved from Swan Island to Rudie Wilhelm docks. He went ashore at approximately 8:30 a. m. and returned to the vessel that afternoon with a box of ship matches, which he was directed to bring to the vessel for its use by his superior. There were no ship matches aboard. These are special matches used only aboard ships. The libelant was not furnished his meals aboard the ship, but was furnished his lodging on board the vessel in consideration of being a night watchman on the vessel. He had slept on the vessel on the night of June 2nd. After returning to the vessel with the ship matches, the li-belant was seriously injured, sustaining a fracture of the heel bone. Libelant was in a state of shock and the officers of respondents forthwith ordered an ambulance and directed the driver to transport libelant to St. Vincent's Hospital for treatment. St. Vincent's Hospital is not designated by the Public Health Service as a public health station. The Public Health Service has an office in Portland, Oregon, and Physicians & Surgeons Hospital in that city is designated as a public health station. When libelant arrived at St. Vincent's Hospital, he was given a choice of doctors to select from and he selected Dr. William R. McMurray, an orthopedic specialist. A representative of respondents' insurance carrier contacted libelant on June 5, 1959, and June 8, 1959, at St. Vincent's Hospital and at such times notified libelant that he qualified for hospitalization and medical care free of charge through the facilities of the United States Public Health Service. On June 19, 1959, said carrier, by letter, again notified libelant of the availability of such service at Portland, Oregon, giving the room number of the service.

The undisputed medical testimony is that it would not be good medical practice to have moved the libelant from St. Vincent's Hospital before the fracture was reduced and that he was not in physical condition to be moved from the hospital until June 20th, the date of his release. Likewise, the undisputed medical testimony is that the reduction of the fracture was part and parcel of the emergency treatment which was required on the arrival of the libelant at the hospital, or a short time thereafter. The testimony is that the fracture was reduced on the day following admittance to the hospital.

The amount involved in this particular case is of no significance. However, the point of law is new to this jurisdiction and the rule of law which is announced may serve as a beacon on future litigation of this type. Outside of emergency care, the obligation to secure hospital and medical treatment is on the libelant. Code of Federal Regulations,

1949 Ed., Title 42—Public Health.[1] As a matter of fact, even the emergency treatment would have been provided by the Public Health Service if proper application had been made. Code of Federal Regulations, 1949 Ed., Title 42—Public Health, § 32.12.

I am of the opinion that libelant, at the time he received his injury, was a "seaman" under the definition of that word in the Jones Act, 46 U.S.C.A. § 713 and under the common meaning of that word as defined by the courts. Weiss v. Central Railroad Company of New Jersey, 2 Cir., 1956, 235 F.2d 309; McKie v. Diamond Marine Co., 5 Cir., 1953, 204 F.2d 132; Early v. American Dredging Co., D.C.Pa.1951, 101 F.Supp. 393; Braen v. Pfeifer Oil Transportation Co., 361 U.S. 129, 80 S.Ct. 247, 4 L.Ed.2d 191; Senko v. La Crosse Dredging Corp., 1957, 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404.

Since the libelant was a seaman and was engaged in the service of the ship at the time of receiving his injury, he was entitled to maintenance at the rate of $8 per day as provided for in the union contract, even though he was paying for his own board and lodging at the time. No doubt, the amount of libelant's wages was enhanced by reason of the fact that he was providing his own board and lodging. Under such circumstances, he would be entitled to recover at said rate until January 5, 1960, when his condition became stationary, eliminating the days in the hospital when he was there under an emergency treatment as hereinafter mentioned. The E. H. Russel, D.C.1930, 42 F.2d 568, cited by respondents can be reconciled. The facts in that case were quite different from the facts at bar. It is admitted in this case that $8 per day is reasonable. There was no contractual provision involved in the Russel case.

The facts in The Bouker No. 2, 2 Cir., 241 F. 831, are quite different than the facts in the case at bar and that case is not controlling. The fact that the libelant, in this case, furnished his own meals and had engaged a room in a hotel for his living quarters at the time of the accident does not preclude his recovery of maintenance. Weiss v. Central Railroad Company of New Jersey, supra; McKie v. Diamond Marine Co., supra.

We now approach the issue on whether the libelant is entitled to the cost of his hospitalization and the cost of his doctor's services. I hold that the parties acted in an emergency when the libelant was sent to St. Vincent's Hospital and that the cost of the immediate emergency care should be paid by the respondents. Title 42 U.S.C.A. § 249, and the regulations promulgated by the Public Health Service required the libelant to make application to such service for his maintenance and cure during his disability. It is undisputed that libelant had actual knowledge of the availability of the facilities of the Health Service on and after June 5, 1959. In addition, the libelant would be presumed to know the law and have knowledge of the regulations. There is no reason why he could not have contacted the Health Service, through an agent or otherwise, on June 5th or thereafter. The doctor's statement indicates that the doctor either called on the patient or the patient called at the doctor's office on at least ten occasions after June 5th. I feel that the doctor's bill chargeable against the defendant should not exceed $200, and I hold that sum is reasonable and was incurred in an emergency. Likewise, the hospital bill amounting to $106.45 incurred to and including June 5, 1959, was contracted in the emergency and the respondents are liable therefor.

A decree will be awarded to the libelant for maintenance at the rate of $8 per day from June 5, 1959, to and including January 4, 1960, and for the further sum of $306.45 on libelant's doctor and hospital bills. Libelant's proctors may draft findings and conclusions in conformity with this opinion.

1. §§ 32.13, 32.14.